IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

MARTHA WELLMAN and
CHARLES WELLMAN,

                Plaintiffs,

v.                                    CIVIL ACTION NO. 3:10-0147

BOBCAT OIL & GAS, INC.,

                Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending are Plaintiffs' Motion for Partial Summary Judgment that the Lease has Terminated Due to Nonproduction as Required by the Plain Language of the Lease (ECF No. 210), Plaintiffs' Motion for Partial Summary Judgment that Lease is Null and Void as a Result of Defendant Failing to Pay Plaintiffs Royalties in Accordance with the Plain Language of the Lease (ECF No 209), and Defendant's Motion for Summary Judgment (ECF No. 208).  For the reasons given in this Memorandum Opinion and Order, and consistent with this Court's December 20 Order (ECF No. 250), Plaintiffs' motions (ECF Nos. 209 and 210) are **DENIED.**  Defendant's Motion (ECF No 208) is **GRANTED** in part and **held in abeyance** in part.

**I.    Background**

**A. Facts**

In 1933, Ida Dean Purdue executed a lease with Chartiers Oil Company which allowed Chartiers to extract the minerals from a mineral estate she owned in Wayne County, West Virginia.

Def.'s Mot. for Summ. J., No. 208, Ex. 1. The lease interest in that estate changed hands over the years, but the original lease contract remained the operative agreement regarding the mineral estate, and Ida Dean Purdue remained the lessor. In 1978, the Plaintiffs in this case, Charles and Martha Wellman, acquired ownership of the mineral estate from Purdue. In 1993, Defendant in this case, Bobcat Gas and Oil ("Bobcat"), acquired the lease interest in the mineral estate from PIP Petroleum. The 1933 lease continued to govern.

Defendant extracted natural gas from a single well on the mineral estate and conveyed it to a saleable location through a pipeline owned by Columbia Natural Resources ("Columbia"). Up until around 2009, Defendant leased some of the Columbia pipeline's capacity to use in transporting the gas it extracted on an "interruptible" basis, wherein Columbia could refuse to allow Defendant pipeline capacity during times when it desired to use the capacity for other purposes. The result of this interruptible-basis contract appears to have been that sometimes Defendant had no means to transport any gas from the mineral estate, and so extracted no gas. Defendant calls this being "shut-in" by Columbia. *See* Pls.' Mot. for Summ. J.-Nonpayment, No. 209, at 1-3; Def.'s Mot. for Summ. J., No. 208, at 1-3.

Facts beyond these basic business relationships are largely disputed. The parties dispute the length of the shut-ins, Defendant's policies toward the shut-ins, and the length and cause of other cessations in gas extraction which may have occurred. Additionally, Plaintiffs allege, and Defendant denies, a series of events relating to well production. Specifically, Plaintiffs allege that at some point between 2004 and 2008, Defendant did not issue some royalty payments as required, and represented to Plaintiffs that the gas well was not producing. Plaintiffs contend that they went to Defendant's Wayne County office with some of their complaints, where they spoke to Bobcat

-2-

employees Theresa Maynard and Lillie Beth Young.[1] These employees allegedly represented to the Wellmans that the well was not producing and that Bobcat was falsifying the production records. At least one such visit is documented on the date of October 31, 2007. Def.'s Mot. Summ. J., No. 208, at 6-7. Defendant argues that the details of these supposed encounters are ill-remembered and not recorded, that it did not represent that the well was non-productive, and that it did not falsify production records. *Id.* at 6.

### B. The 1933 Lease

Plaintiffs and Defendant are assignees of the 1933 lease entered into by Ida Dean Purdue and Chartiers Oil Company ("1933 lease"). Def.'s Mot. for Summ. J., No. 208, Ex.1, at 1 (hereinafter "Lease"). Neither party contends that any of the multiple assignees to that lease have made changes to its terms.

The 1933 lease provides for a 1/8th royalty on all oil produced and a flat royalty payment of $75.00 each quarter for any natural gas produced. Lease at 1. Specifically, the lease provides that the lessee must pay "Seventy Five ($75.00) dollars each three months in advance for the gas from each and every gas well drilled on said premises . . . to be paid each three months thereafter while the gas from said well is marketed and used." *Id.* The lease has a primary term of ten years, then extends under a secondary term for "as long thereafter as oil or gas, or either of them, is produced from the said land . . ." *Id.* Although Plaintiffs point out that West Virginia now disfavors flat rate mineral leases as a matter of public policy, *see* W. Va. Code § 22-6-8, neither party argues that the lease is legally unenforceable.

---

[1] Plaintiff Martha Wellman's testimony is not clear on whether she spoke to either or both of these employees. However, it is admitted that she interacted with Theresa Maynard at some point regarding the Bobcat lease. *See*, *e.g.*, Def.'s Mot. for Summ. J, No. 208, Ex. 12, M. Wellman Deposition at 65-66.

## C. The Instant Proceedings

Plaintiff's Amended Complaint (ECF No. 25), filed July 2010, contains five counts: (1) breach of contract; (2) breach of common-law duties; (3) fraudulent concealment of mineral extraction; (4) declaratory judgment that the lease is null and void because Defendant did not produce gas from the mineral estate on a consistent basis; (5) negligent or intentional trespass. Plaintiffs seek compensatory and punitive damages, an injunction against further gas extraction, an accounting of the mineral proceeds extracted, declaratory judgment that the lease is null and void, and attorneys fees and costs. Plaintiffs have filed two motions for partial summary judgment, and the Defendant has filed a motion for summary judgment.

## D. Legal Standard

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P.* 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256.

The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## II. Plaintiffs' Motion for Partial Summary Judgment that Lease has Terminated Due to Nonproduction as Required by the Plain Language of the Lease (ECF No. 210)

Plaintiffs move for partial summary judgment on the basis that Defendant's allegedly inconsistent production of gas from the Plaintiffs' mineral estate terminates the lease because its secondary term continues only for "as long thereafter as oil or gas, or either of them, is produced from the said land . . ." *See* Lease at 1; Pls.' Mot. for Summ. J.-Nonproduction, No. 210. Therefore, Plaintiffs argue, when production ceased, the lease terminated, and any gas production from the mineral estate after the lease terminated was unlawful. Additionally, any other activity on the Plaintiffs' land after the lease terminated was trespassory. Resolving this motion requires deciding whether, as a matter of law, the secondary term of the 1933 lease can be terminated by nonproduction of gas.

### A.

Plaintiffs move for summary judgment on the basis that Defendant stopped production under the lease at various points in the 2000's, ending the secondary term of the lease, which is only valid for "as long thereafter as oil or gas, or either of them, is produced from the said land . . ." Lease at 1. Defendant argues that the secondary lease term does not expire if production ceases, because Defendant produced gas, paid for through a flat-rate royalty, rather than oil, which would have required royalty payments based on actual production. Defendant reasons that because the payment due Plaintiffs was $75.00 quarterly regardless of how much gas was produced, the contractual

arrangement was not actually subject to a production requirement.  *See* Def.'s Resp., Pls.' Mot. Summ. J-Nonproduction, No. 212, at 3.

Defendant's argument derives from a West Virginia Supreme Court of Appeals case, *Bruen v. Columbia Gas Transmission Corp.*, 426 S.E.2d 522 (W. Va. 1992), and its antecedents.  *Bruen* involved a 1907 oil and gas lease with a secondary term which extended the lease "so long thereafter as oil or gas is produced from the land leased and royalty and rentals paid by lessee therefore."  *Id.* at 552.  The lease in *Bruen* required a 1/8 royalty on oil, a $200 annual rent for each gas well, and a $1200 yearly advance payment to the lessee, from which all royalties were subtracted.  *Id.*  These terms are similar to the 1933 lease, excepting the $1200 annual "rent."

In *Bruen*, the mineral estate owners sued the mineral estate lessee, arguing that the lease terminated because the well did not "produce" at various points between 1928 and 1971.  *Id.* at 524-25.  The jury found for the plaintiffs and determined that they were owed damages of more than $29 million.  *Id.*  On appeal, the West Virginia Supreme Court of Appeals found that the Circuit Court had erred in instructing the jury that "produced" means "produced in paying quantities," because the quantity of production was immaterial.  *Id.* at 527.  The *Bruen* Court concluded that "in flat-rate leases, such as the one in this case, quantity of production is irrelevant."  *Id.* at 525.

**B.**

Plaintiffs attempt to distinguish *Bruen* in two ways, both of which fail.  First, Plaintiffs argue that the lease in *Bruen* is different than the 1933 Lease because the *Bruen* lease provided for a $1200 "override" annual rent, along with a $200 annual rent per natural gas well.  Pls.' Mot. for Summ. J- Nonproduction, No. 210, at 14.  However, this difference appears superficial, because the logic of *Bruen* applies regardless of whether the flat rate owed was $1200 plus $200 per well, or just the

-6-

$200 per-well flat rate. Additionally, *Bruen* cites approvingly *McCutcheon v. Enon Oil & Gas Co.*, 135 S.E. 238 (W. Va. 1926), and *McGraw Oil & Gas Co. v. Kennedy*, 64 S.E. 1027 (W. Va. 1909), both of which considered leases with per-well flat-rate payments. *Id*. at 525.

Second, Plaintiffs argue that *Bruen* can be distinguished because that case inquired whether production must be in "paying quantities" to avoid lease termination. Pls.' Reply, Pls.' Mot. for Summ. J.- Nonproduction, No. 216, at 3. Here, Plaintiffs contend that no gas was produced at all, not that it was produced in non-paying quantities. They claim that because the question in this case is whether there was any production, not whether there was a "paying" quantity of production, *Bruen* does not apply to this case.

Plaintiffs' argument fails. *Bruen* is explicit that "quantity of production is irrelevant." *Bruen*, 426 S.E.2d at 525. This proposition applies equally to situations where production is zero and where production is "non-paying." Additionally, *Bruen* ratifies several older cases holding that the lessee of a flat-rate lease simply has no interest in the production of the leased well. For example, *Bruen* reaffirms *McGraw*, 64 S.E. at 1027-28, in which the lessee held a flat-rate lease on a well, and paid the required annual rent, even though "no gas from the well was marketed; but it was closed [. . . ]." The *McGraw* court held that the lease, which provided for a secondary term of "so long thereafter as oil and gas, or either of them, is produced [. . . ]" did not terminate, even though the lessee produced no gas from the well in question. These facts closely mirror the present case. *Bruen* also reaffirms *McCutcheon*, 135 S.E. at 238 , where a flat-rate gas lessee shut in a well and produced nothing from it for some period, yet the lease did not terminate. The court held that "[t]he lessee had the right to shut the gas in and pay the stipulated price. It would be of little concern to the lessor what was done with the gas, if he gets his payments." *Id*. at 241; *Bruen,* 426 S.E.2d at

526. *See also Goodwin v. Wright*, 255 S.E.2d 924, 926 n. 3 (W. Va. 1979) (noting that under *McGraw*, a lessee paying under a flat-rate gas rental could "hold the lease even if he capped the well.") *Bruen* thus affirms the well-established case law which Plaintiffs attempt to dismiss as "several 80 to 102 year old West Virginia cases." Pls.' Reply, Pls.' Mot. for Summ. J.-Nonproduction, No. 216, at 3. Far from being obsolete, these cases have been reaffirmed as recently as 1992, in *Bruen*. The case law is clear: a lessee who makes the required payments on a flat-rate mineral lease may avoid this contractual termination clause of the lease agreement even without producing any minerals from the leased mineral estate.

The Court reaches this result with some reluctance. The express language of the lease does seem to contemplate that the lease continues only so long as the gas production is ongoing. *See, e.g.*, Lease at 1 (requiring royalties " to be paid each three months thereafter while the gas from said well is *marketed and used*.") (emphasis added). Further, the type of flat-rate lease at issue in this case has been condemned by the State of West Virginia as inequitable. In fact, it is now the "public policy" of West Virginia to prevent the "extraction, production, or marketing of oil or gas under a lease or leases or other continuing contract or contracts providing a flat well royalty or other similar provisions for compensation . . . which is not inherently related to the volume. . . produced." W. Va. Code § 22-6-8 (b) (1994 W. Va. Acts Ch. 61). However, the West Virginia legislature cannot overwrite pre-existing contracts, *see, e.g.*, U.S. Const. art. 1, § 10; W. Va. Code § 22-6-8 (a)(4), so neither of these concerns is sufficient to overcome the plain dictate of *Bruen* and its antecedents. Therefore, the Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment (ECF No. 210) and **GRANTS in part** Defendant's Motion for Summary Judgment (ECF No. 208) on this issue.

**III. Plaintiffs' Motion for Partial Summary Judgment that Lease is Null and Void as a Result of Defendant Failing to Pay Plaintiffs Royalties in Accordance with the Plain Language of the Lease (ECF No 209.)**

Plaintiffs also move for partial summary judgment on the basis that Defendant's late or non-payment of several quarterly royalty payments breaches the provision of the lease requiring the lessee to pay the lessor quarterly, thus terminating the lease. ECF No. 209. Defendant moves for summary judgment on the same issue. *See* ECF No. 208.

### A. The 1933 Lease

The 1933 Lease between Defendant and Plaintiffs provides for quarterly flat-rate payments of $75.00, paid "in advance," for natural gas produced from the mineral lease. Lease at 1. The parties agree that 71 total payments have been due from Defendant since it acquired its lease rights. Plaintiffs believe that the payments are due on the 29th day of January, April, July, and October of each year. Pls.' Mot. for Summ. J.-Nonpayment, No. 209, at 7. Defendant disputes that any specific payment schedule is required under the lease.

Plaintiffs allege that it is "undisputed that Bobcat has failed to pay the Wellmans on time, or at all, as required by the lease, on eight occasions." Pls.' Mot. for Summ. J.-Nonpayment, No. 209, at 3. Of the 71 payments due, Plaintiffs allege that at least eight were defective: seven checks were issued after the date the payments were due, and one check never issued at all. The allegedly late payments were due between 1995 and 2003.[2] Additionally, Plaintiffs allege that at least one

---

[2] Because the statute of limitations for contract claims is 10 years in West Virginia, the Court would be barred from considering any alleged breach of the payment condition that took place before 2000. W. Va. Code § 55-2-6.; s*ee G.T. Fogle & Co. v. King*, 51 S.E.2d 776, 784 (W.Va. 1949) ("It is well established in the decisions that when money recovery is sought on an obligation payable in installments, the statute of limitations commences to run against each installment from the time it becomes due.").

payment, for the first quarter of 2004, was never made at all. Plaintiffs do concede that 25 checks were issued on time, and admit they do not know whether the other 38 payments owed over the course of the lease were timely. *See* Pls.' Mot. For Summ-J- Nonpayment, No. 209, at 5; *see also id*., Ex. 5, Summary of Bobcat Payment Data. These allegations amount to two separate alleged payment defects: first, that some payments were not timely, and second, that some payments were not made at all.

Defendant claims to offer evidence that all payments were issued, offering 50 canceled checks and 21 check stubs. *See* Def. Mot. Summ. J., No. 208, Ex. 10. Defendant acknowledges that Plaintiffs did not cash some of the checks for which stubs are offered as evidence, but contends the stubs are evidence that the checks were in fact tendered. "[W]e could send her the check. We can't make her cash it, just as we can't make her cash the ones she's received since 2008 that she's sitting on." Def.'s Resp., Pls.' Mot. Summ. J.-Nonproduction, No. 212, Ex. 2, Mary Young Deposition, at 20.

The parties thus raise significant issues of fact as to when, and whether, certain checks were issued; contrary to Plaintiffs' assertion, the payment defects are not "undisputed." However, what is undisputed is the fact that Plaintiffs accepted and cashed Defendant's quarterly payments for the year 2007. This negates any need to resolve the disputed issues of fact regarding the defects in earlier payments, because Plaintiffs' acceptance of the 2007 payments ratified any breach that may have occurred before that year. Pursuant to that ratification, Plaintiffs are prevented from now claiming that any defective payment due before 2007 terminates the lease contract.

### B. Ratification

By their own admission, Plaintiffs received and cashed the royalty payments for the four quarters of 2007, even after some earlier payments were alleged to be late or missing. *See* Pls.' Mot. For Summ-J- Nonpayment, No. 209, Ex. 5. Plaintiffs now seek rescission based on late or missing checks from various points between 1995 and 2006, but they cashed many royalty checks during and after any such periods of delay, and did not complain of some delayed or missing payments for years. *See* Def.'s Resp. to Pls.' Mot. Summ. J- Nonpayment, No. 213, at 6. As a general principal, ratification takes place, and there is no breach justifying rescission, "so long as the injured party elects to treat the contract as continuing." *Atl. Bitulithic Co. v. Town of Edgewood*, 137 S.E. 223, 225 (W. Va. 1927) (internal citations omitted). Additionally, West Virginia law specifically prohibits a lessor from accepting imperfect performance under a lease on an ongoing basis, then complaining of the accepted breach. *See Ohio Fuel Oil Co. v. Greenleaf*, 99 S.E. 274, 279- 80 (W. Va. 1919) ("It has been held repeatedly that, where the continuance of a lease such as this depends upon the payment of money by a certain time, any conduct upon the part of the lessor which would indicate that the time of payment might be extended, or conduct on his part indulging the lessee in making such payment, would estop him from claiming that the lessee's rights had ceased.") (citing *Hukill v. Myers*, 15 S.E. 15 (W. Va. 1891)*; Pyle v. Henderson*, 63 S.E. 762 (W. Va. 1909); *Monarch Gas Co. v. Roy,* 95 S.E. 789 (W. Va. 1918)). Plaintiffs offer no contrary interpretation of this precedent. It is thus apparent that when Plaintiffs accepted the quarterly payments throughout 2007, they ratified any defects in payments due before 2007, and may not now claim that such defects justify rescission. Plaintiffs' Motion for Summary Judgment (No. 209) is therefore **DENIED**.

At oral argument, Plaintiffs argued, for the first time, that Defendant breached the lease by issuing late royalty payments in 2008 and later years, after the 2007 payments which Plaintiffs accepted, ratifying any earlier breaches. Plaintiffs admit they received, but did not cash, checks issued by Defendant after 2007; Defendant agrees that the checks were never cashed. The Court therefore **ORDERS** supplemental briefing, as detailed in the accompanying Order (ECF No. 250), on the question of whether any such post-2007 delayed payments are sufficient to terminate the lease contract.

### IV.  Conclusion

As detailed above, both of Plaintiffs' Motions for Partial Summary Judgment are **DENIED**. Defendant's Motion for Summary Judgment is **GRANTED in part**. The Court finds, consistent with this opinion, that Defendant did not breach the lease through any lapses in gas production, and thus grants Defendant partial summary judgment on Count 1. Next, Plaintiffs have not advanced or explained any common law duties which Defendant may have owed them and breached, and so there is no material issue of disputed fact as to Count 2, and the Court grants Defendant summary judgment on Count 2. Additionally, the Court grants summary judgment for Defendant on Count 3. Because gas production was immaterial to Plaintiff's rights under the lease, any concealment of mineral extraction could not be fraudulent. A successful fraud claim requires several elements absent in this case: materiality, reliance, and damage, among others. *See, e.g.*, *Cordial v. Ernst & Young*, 483 S.E.2d 248, 259 (W. Va. 1996). Because Plaintiffs could not change their position regarding the well in response to any information about gas production from Defendant, be it true, false, or fraudulent, any representations could not be material, Plaintiffs could not rely on them, and could not be damaged by them. Last, Plaintiffs' Count 4, which asks for Declaratory Judgment that

the Lease is Null and Void, requests such judgment only on the issue of gas production. Amended Complaint, ECF No. 25, at 6-7. The Court granted Defendant summary judgment on this same issue styled as a contract claim, *see* Count 1, and likewise grants the defendant summary judgment on Count 4.

After subtracting out Counts 2, 3, and 4, and part of Count 1, only a limited area is left for exploration and resolution. The Court has ordered supplemental briefing on the effect of any late payments made after 2007 on the breach of contract claim (Count 1). ECF No. 250. Count 5, which alleges trespass, is interwoven with Count 1, so Defendant's Motion for Summary Judgment is **held in abeyance** as to Counts 1 and 5 pending the supplemental briefing. The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: December 21, 2011

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE